736 F.Supp. 1007 (1990)
In re CHRYSLER MOTORS CORPORATION OVERNIGHT EVALUATION PROGRAM LITIGATION.
MDL No. 740.
Nos. 87-1180C(1), 87-1201C(1), 87-1762C(1), 88-0009C(1) to 88-0015C(1), 88-0072C(1) and 88-0165C(1).
United States District Court, E.D. Missouri, E.D.
April 26, 1990.
Lead Counsel: Dianne Nast, Kohn Savett Klein & Graf, David Berger, Berger & Montague, Philadelphia, Pa., Stephen Gardner, Asst. Texas Atty. Gen., Dallas, Tex., *1008 Charles M. Thompson, Thompson Griffis & Hooper, Birmingham, Ala., Charles A. Newman, Thompson & Mitchell, St. Louis, Mo., William T. McLellan, Chrysler Motors Corp., Highland Park, Mich., Thomas E. Dittmeier, U.S. Atty., Terry Adelman, James Steitz, and James Martin, Asst. U.S. Attys., St. Louis, Mo.
Liaison Counsel: Hardy C. Menees, Ebert Menees & Kriegel, Joseph F. Devereux, Jr., Leonard J. Frankel, Guilfoil Petzall & Shoemake, St. Louis, Mo., Clayton Friedman, Asst. Missouri Atty. Gen., St. Louis, Mo.
Other Counsel: Theodore R. Opperwall, Dickenson Wright Moon VanDusen & Freeman, Detroit, Mich., Randolph A. Veazey, Glasgow & Veazey, Nashville, Tenn., Roxanne T. Daneri, Sacramento, Cal., Michele M. Mulder, National Bank of Detroit, Detroit, Mich., Richard H. Goetz, Goetz & Sipe, Tucson, Ariz., Fredrick N. Egler, Jr., Egler Garrett & Egler, Pittsburgh, Pa., Dean A. Brown, Fort Wayne, Ind., Rodger N. Bowman, Clarksville, Tenn., H. Sol Clark, Clark & Clark, Savannah, Ga., Richard F. Huck, III, Evans & Dixon, St. Louis, Mo., Kenneth Halvachs, Gundlach Lee Eggman Boyle & Roessler, Belleville, Ill.

MEMORANDUM
NANGLE, District Judge.
This case is now before this Court on the petitions of class attorneys for attorneys' fees and costs incurred during the pendency of this class action. The firms of Berger & Montague, P.C., and Kohn, Savett, Klein & Graf, P.C., served as lead counsel; and the firms of Guilfoil, Petzall & Shoemake and Ebert, Menees & Kriegel served as liaison counsel. On November 21, 1988, this Court held a hearing relating to the reasonableness of these fee petitions after notifying the class of the pendency of the hearing and the opportunity to object to those petitions. Prior to the hearing, all of the firms were required to comply with a pretrial order that necessitated the itemization of the fees and hourly rates they were requesting.[1] It became clear prior to the hearing that defendants were not contesting the straight time or "lodestar" amounts that lead and liaison counsel were requesting up until the date of the hearing.[2] The fee petitions of lead and liaison counsel have been supplemented subsequent to the hearing and contain fee amounts for the period of time from December 3, 1988, to September 15, 1989. Accordingly, the petitioners have not yet submitted to this Court an itemization of their hours and fees from September 16, 1989, through the present.
Despite the fact that the attorneys have assumed throughout the filing of their petitions and the pendency of the hearing on attorneys' fees that this Court would calculate a "lodestar" and then determine whether a multiplier was appropriate, a review of current precedent warrants the utilization of a different procedure for calculating fees. Criticism of the "lodestar" *1009 and multiplier approach to ascertain fees in common fund cases has grown rapidly in the recent past. Accordingly, many courts, including the Supreme Court,[3] have taken note of the fact that the awarding of a percentage of the recovery in a class action common fund case is a more appropriate and efficient means of calculating an attorneys' fee award.
In light of what this Court believes is a healthy trend, class counsel will be awarded 17.5 percent of the settlement fund.[4] It then will be the responsibility of class counsel to divide this amount of money among themselves within thirty days of the date of this order. When dividing these fees, the predominate consideration should be the relative contribution of the different attorneys or firms rather than hourly rates or hours expended. Howes v. Atkins, 668 F.Supp. 1021 (E.D.Ky.1987). In the event petitioners' counsel are unable to successfully determine the appropriate division of these monies, they may then petition this Court in such a manner as to make clear what fee issues they have resolved and what issues remain unresolved. This Court believes that it is petitioners' responsibility to determine the appropriate division of the fee award. It will also be necessary for this Court to approve and order any division of this money and to provide for the ultimate distribution from the fund. This Court will retain jurisdiction over the issue of fees and costs as long as it is necessary to resolve these questions.

I. Background of This Litigation

On June 24, 1987, the United States Government issued and filed an indictment in a case captioned United States of America v. Chrysler Motors, et al., Cause No. 87-165CR(1). Subsequently, on December 14, 1987, Chrysler Motors Corporation entered a plea of nolo contendere to all sixteen counts of the criminal indictment.
Immediately after the initiation of the criminal proceedings, the civil proceedings against Chrysler Motors Corporation commenced through the filing of separate causes of action by Shirley A. Jones, a Missouri resident, and James Donaldson, a New Jersey resident, in the United States District Court for the Eastern District of Missouri and for the Eastern District of Pennsylvania. These plaintiffs brought these actions on behalf of themselves, in addition to members of a class of persons similarly situated. Several other class actions subsequently were filed by plaintiffs, who also alleged damages resulting from Chrysler's Overnight Evaluation Program. On December 17, 1987, the Judicial Panel on Multi-District Litigation transferred all actions arising out of the Chrysler Overnight Evaluation Program to this District and designated this litigation In re Chrysler Motors Corporation Overnight Evaluation Program, MDL No. 740.
Before these actions were transferred to this District, the class was conditionally certified for settlement purposes in James Donaldson v. Chrysler Motors Corporation, Cause No. 87-3920 (E.D.Pa.), and Patricia Bacon and Noylo Leasing v. Chrysler Corp., Cause No. 87-4104 (E.D.Pa.). In October and November of 1987, Chrysler executed a Memorandum of Settlement with a number of attorneys general, in addition to entering into a Master Settlement Agreement with class petitioners. Under the terms of the Master Settlement, Chrysler was obligated to establish a fund in the amount of $16,375,000.00,[5] which would expand, if necessary, to provide the minimum payment per class member of $500.00. In order to encourage the continuation of settlement efforts, this Court entered its Practice and Procedure Order on January 5, 1988, in which it adopted the *1010 earlier order conditionally certifying a class for purposes of settlement.
Pursuant to the terms of the Master Settlement Agreement and the Memorandum of Settlement, class counsel and the attorneys general conducted an extensive "due diligence" review of all record, including computer data bases, from Chrysler and other sources for the purpose of identifying potential members of the class. As a result, the parties agreed to notify 39,170 putative members of the class whose names and addresses were compiled on a mailing list. This list, therefore, included those persons identified by Chrysler, on its own initiative and from its records in July of 1987, in addition to approximately nine thousand persons added through the intensive due diligence efforts of counsel for class plaintiffs in cooperation with Chrysler.
On August 24, 1988, putative class members, who were identified during due diligence discovery, were notified by first class mail of the status of the class action, the terms of the proposed settlement and their right to exclude themselves from the class. In addition, the notice stated that class counsel could petition for fees in an amount not greater than twenty percent. The same information was included in a summary notice published in twenty major metropolitan newspapers. At that time, the class of people defined by this Court's pretrial order constituted:
All persons or entities residing in the United States, including its possessions and territories, who owned a motor vehicle on July 31, 1987, that meets the following three requirements: one, the motor vehicle was manufactured by Chrysler Motors Corporation ("Chrysler") before October 9, 1986; two, the motor vehicle was originally sold by Chrysler as a new vehicle; and three, the vehicle was driven prior to its original sale in Chrysler's Overnight Evaluation Program ("OEP"). This class does not include Chrysler, its affiliates and persons who own a motor vehicle originally purchased through Chrysler's Employee/Retiree New Vehicle Purchase Program. OEP means Chrysler's vehicle quality control test driving program as practiced by Chrysler prior to October 9, 1986, and pursuant to which certain employees at Chrysler's manufacturing plants randomly selected a small percentage of each day's production vehicles to evaluate by means of test driving said vehicles on public highways to and from their homes. The term OEP also includes any practice engaged in by Chrysler prior to October 9, 1986, whereby vehicles that Chrysler manufactured were both driven on public roads and subsequently were sold to a dealer for resale with an odometer reading that did not reflect the miles accumulated while being so driven.
This class definition subsequently would be amended to include participants in Chrysler's Employee/Retiree New Vehicle Purchase Program.
Approximately 735 putative class members elected to opt out of the class by returning their request for exclusion forms to the Court prior to the fairness hearing which was held on October 11, 1988. In its December, 1988, hearing, this Court subsequently determined that both the Memorandum between Chrysler and the Attorneys General, in addition to the Master Settlement Agreement executed by Chrysler and class counsel, complied with the requirements of Rule 23(e) of the Federal Rules of Civil Procedure. Under the terms of these settlements, each participant who submits a verified claim is guaranteed a minimum recovery of $500.00, in addition to an extended warranty. In addition, the court unconditionally certified the class and concluded that the best notice practicable was given to class members under the circumstances. This Court's traditional equitable powers were retained in order to ensure the orderly administration of the settlement.
In February of 1989, counsel for class plaintiffs, the Attorneys General, the United States of America and Chrysler believed it appropriate, with the approval of this Court, to reopen due diligence discovery *1011 and to seek an amendment of the class description. These actions were motivated by a desire to implement fully the settlement in these class actions, to compensate as many claimants for which it is appropriate to provide and to attempt to resolve certain aspects of United States of America v. Chrysler Motors, et al., Cause No. 87-176CR(1).
As a result of this additional due diligence work, certain parties, who met the requirements of the class certified in this Court's order of December 2, 1989, were newly identified. In addition, the discovery process provided for the identification of new class members believed to be owners of vehicles originally purchased through Chrysler's Employee/Retiree New Vehicle Purchase Program. Throughout this process, class counsel and the representative parties fairly, adequately and vigorously represented the interests of the broadened class. The class identified by the parties subsequent to the reopening of due diligence discovery was comprised of a total of 43,556 known class members.
On June 30, 1989, this Court entered an order, which both conditionally amended the definition of the settlement class and determined that the proposed notices satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure. The notices were then disseminated on July 3, 1989.
On September 8, 1989, this Court held a second fairness hearing to determine the fairness and adequacy of the revised settlement and the effect the amendment of the class had on the original members of the class. On the basis of the record, the objections and the relevant law, in its order entered on November 24, 1989, this Court held that "the revised settlement and the inclusion of the additional and new class member is fair, reasonable and adequate." This Court, in that order, again retained jurisdiction over the settlement of the case and reserved its power to enter additional orders to effectuate the fair and orderly administration of the settlement.
The administration of the settlement procedure has, in fact, been laborious and complex. To aid in this process, on September 22, 1989, this Court appointed a claims committee, which included lead and liaison counsel for class plaintiffs. As of February 2, 1990, 27,172 claims were verified. Pursuant to this Court's order of January 5, 1990, these class members were sent checks in the amount of $500.00 on February 2, 1990. They also were informed that contingent upon the amount of additional distributions from the fund and the number of additional claims, class members may or may not receive an additional payment. Approximately 300 additional claims have been approved by the claims committee and will be paid in the near future.[6]

II. Litigation Over Petitioners' Fee Petitions

On November 21, 1988, this Court held a hearing to determine the reasonableness of the petitioners' fee petitions. The initial portion of the hearing was devoted to oral argument relating to the appropriateness of a multiplier under the circumstances of this case. The "lodestar" of lead and liaison counsel was accepted by the parties as fair and reasonable. Defendant, the Attorneys General and Public Citizens Group all contended that a multiplier was not appropriate under the circumstances of this case under relevant law. They further argued that both the quality and risk factors did not justify an enhancement.
In response to these arguments, lead and liaison counsel contended that a different standard applies to common fund cases as distinguished from statutory fee shifting cases. Petitioners called attention to the fact that the vast majority of the precedent cited by defendants and the Attorneys General applied to statutory decisions rather than actions in which a common fund had been created. Petitioners further contended that under precedent governing common fund cases, they are entitled to a multiplier.[7]
*1012 There is no question that this case constitutes a common fund case. Moreover, the standards governing fee awards in common fund cases as opposed to statutory fee shifting cases are clearly different. This Court, however, does not feel that it is necessary to address the question of the appropriateness of a multiplier under the circumstances of this case. Instead, this case shall be utilized as an opportunity to join the growing number of courts who have recognized that awarding a percentage of the fund is a more efficient, effective and fair mechanism for determining fees in a common fund class action. In light of the fact that this approach may still be considered novel, the time will be taken to examine in detail both the precedent favoring this procedure in addition to the negatives associated with the lodestar and multiplier procedure.

A. The Distinction Between Common Fund and Statutory Fee Cases.
In a recent decision in which the Supreme Court cut back significantly on the ability of plaintiffs' attorneys to recover fees in statutory fee-shifting cases, the Court drew a distinction between the case before it and "common fund" cases. The Court expressly recognized that "[u]nlike the calculation of attorneys' fees under the common fund doctrine, where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under § 1988 reflects the amount of attorney time expended on the litigation." Blum v. Stenson, 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 1550 n. 16, 79 L.Ed.2d 891 (1984). The Court, thus, expressly recognized the distinction both between common fund and statutory fee cases, and the mechanism for awarding fees in those different types of cases.
The common fund doctrine reflects a traditional equitable practice and stands as a well-recognized exception to the general rule that each litigant must bear his attorneys' fees. Boeing Company v. Van Gemert, 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980). Under the doctrine, it is well recognized that a lawyer who recovers a common fund for the benefit of others or his client is entitled to a reasonable attorney's fee from the fund. Id.; Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The notion that an attorney creating a fund is entitled to a reasonable fee is premised upon the equitable principles of the prevention of windfall and unjust enrichment. Boeing Company v. Van Gemert, 444 U.S. at 478, 100 S.Ct. at 749; 3 Newburg on Class Actions § 14.02 at pp. 185-86 (1986). "Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorneys' fees against the entire fund, thus spreading fees proportionately among those benefited by the suit." Boeing Company v. Van Gemert, 444 U.S. at 478, 100 S.Ct. at 749.
The Supreme Court recognized over a century ago that attorneys had a claim to fees payable out of a common fund which they had created through their efforts. Machburn v. Natural Healthcare, Inc., 684 F.Supp. 679, 687 (M.D.Ala.1988), citing, Central R.R. & Banking Co. v. Pettus, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885); 4 Newburg, Attorney Fee Awards § 2.01 at 23 (1986), citing, Trustees v. Greenough, 105 U.S. 527, 532, 15 Otto 527, 532, 26 L.Ed. 1157 (1881). From the time of these decisions until the Third Circuit Lindy decision in 1973, fee awards granted pursuant to the common fund exception were computed as a percentage of the fund.[8] H. Newburg, Attorney Fee Awards, § 2.02 at 31 (1986); Court Awarded Attorneys Fees, Report of the Third Circuit Task Force, October 8, 1985, 108 F.R.D. 237, 242 (1985) ("Task Force Report"). *1013 Currently, courts are beginning to recognize that the percentage approach is the appropriate mechanism for awarding fees in common fund cases and are at the same time carefully recognizing the difference between common fund and statutory fee cases. Blum v. Stenson, 465 U.S. at 900 n. 16, 104 S.Ct. at 1550 n. 16; Skelton v. General Motors Corp., 860 F.2d 250 (7th Cir.1988), cert. denied, ___ U.S. ___, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989); Brown v. Philips Petroleum Co., 838 F.2d 451 (10th Cir.), cert. denied, ___ U.S. ___, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); In re Union Carbide Corp. Consumer Products Business Securities Litigation, MDL 692, 724 F.Supp. 160 (S.D.N.Y.1989); In re Churchfield Management & Inv. Corp., 98 B.R. 838 (N.D.Ill.1989); In re Agent Orange Product Liability Litigation, 611 F.Supp. 1296 (E.D.N.Y.1987).
Almost all of the precedent cited by defendants in their brief is premised upon statutory fee cases rather than common fund cases.[9] Defendants fail to admit the distinction and, in the alternative, argue that this case is a statutory fee case because petitioners' complaint is premised upon several statutes that allow for fee shifting. Defendants' contention flies directly in the face of the basic definition of a common fund case. As a matter of course, once a fund is created "[t]he attorneys' fee award is then taken as a share of the fund, thereby diminishing the sum ultimately retained by the plaintiff class. Similar to the way a plaintiff's attorney may be compensated by a contingent fee, a plaintiff class pays its attorneys by sharing its recovery with them." Skelton v. General Motors Corp., 860 F.2d 250 (7th Cir.1988), cert. denied, ___ U.S. ___, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989). The Seventh Circuit in Skelton dealt directly with the contention suggested by defendant and rejected the notion that statutory fee principles should apply in those instances that the efforts of petitioners' counsel created a settlement fund:
Even in cases initiated under statutes containing fee-shifting provisions, other circuits have applied common fund principles to determine attorneys' fees when resolution of disputes results in the creation of common funds.... It is clear that, when a settlement fund is created in exchange for release of defendant's liability both for damages and for statutory attorneys' fees, equitable fund principles must govern the court's award of attorneys' fees.
Id. 860 F.2d at 256-57 (citations omitted). The Third Circuit Task Force came to an identical conclusion in its report. It was determined that traditional common fund cases and those statutory cases that are likely to result in the creation of a settlement fund should be treated under like principles when it comes to an award of attorneys' fees. 108 F.R.D. at 255. In view of this precedent and the basic definition of common fund cases, it is clear that common fund principles should determine the fee award in this case.[10]

B. The Lodestar ApproachThe Traditional Mechanism for Awarding Fees in Common Fund Cases.
Ironically, prior to 1973, very few appellate decisions attempted to spell out specific guidelines for fee awards. Instead, it had been the practice in common fund cases for courts to award a reasonable percentage of the fund as a reasonable fee award. Newburg, Attorney Fee Awards § 2.02 at 31. The Third Circuit changed the law by adopting the "lodestar" analysis in Lindy Brothers Buildings, Inc. v. *1014 American Radiator & Standard Sanitary Corp., 487 F.2d 161 (3d Cir.1973), appeal following remand, 540 F.2d 102 (3d Cir. 1976). Under this analysis:
First, the court must determine the hours reasonably expended by counsel that created, protected, preserved the fund. Second, the number of compensable hours is multiplied by a reasonable hourly rate for the attorneys services ... This multiplication of the number of compensable hours by the reasonable hourly rate was said to constitute the `lodestar' of the court's determination.
Task Force Report, 108 F.R.D. at 243.
Under Lindy and its progeny, the lodestar may then be increased, or sometimes decreased, in accordance with two distinct factors: One, the contingent nature or risk involved in the particular case; and, two, the quality of the particular attorneys' work. Id. The Third Circuit went on to define contingency as the "probability or likelihood of success, viewed at the time of filing suit." Lindy II, 540 F.2d at 117; Bebchick v. Washington Metro. Area Transit, 805 F.2d 396 (D.C.Cir.1986). In turn, risk represents the probability of loss and is premised upon the number of hours worked and the cost expended during the litigation. Skelton v. General Motors Corp., 860 F.2d at 257; Lindy II, 540 F.2d at 117. The Third Circuit also considered both the development of prior expertise and the delay in payment as significant factors in the computation of the extent of the risk factor and the amount of the corresponding multiplier. Id.
The second factor that courts must consider when determining whether a multiplier is appropriate and the extent of the multiplier is the "quality" of the particular attorney's work. Lindy II specified three different considerations that must be examined when determining the "quality" of the attorneys' work. First, the complexity and novelty of the issues; two, the quality of the work a judge has been able to observe; and finally, the amount of recovery obtained. Lindy I, 487 F.2d at 168. The Court went on to conclude that "[t]his last factor may be the only means by which the quality of an attorney's performance can be judged where a suit is settled before any significant in-court proceedings."[11]Id.
One year after the decision in Lindy, the Fifth Circuit in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), set forth twelve separate potential factors for consideration in determining an attorney's fee award. These factors are:
(1) the time and labor required;
(2) the novelty and difficulty of the questions involved;
(3) the skill requisite to perform the legal service properly;
(4) the preclusion of other employment by the attorney due to acceptance of the case;
(5) the customary fee;
(6) whether the fee is fixed or contingent;
(7) time limitations imposed by the client or the circumstances;
(8) the amount involved and the results obtained;
(9) the experience, reputation, and ability of the attorneys;
(10) the "undesirability" of the case;
(11) the nature and the length of the professional relationship with the client;
(12) awards in similar cases.
Most commentators, however, consider the test set out in Johnson to be very similar to the analysis under Lindy because the first criterion of the Johnson test is the time and labor required. Moreover, many of the other considerations are subsumed *1015 within the initial calculation of hours reasonably expended at a customary hourly rate. The Task Force Report, 108 F.R.D. at 244.
In the Eighth Circuit, the Court of Appeals and district courts have utilized both the Lindy and Johnson approaches in addition to a combination of the two analysis when awarding fees in the context of a class action in which a common fund had been created. Paschall v. Kansas City Star Co., 695 F.2d 322 (8th Cir.1982), on rehearing en banc, 727 F.2d 692 (1984), cert. denied, 469 U.S. 872, 105 S.Ct. 222, 83 L.Ed.2d 152 (1984); Jorstad v. IDS Realty Trust, 643 F.2d 1305 (8th Cir.1981); Zoll v. Eastern Allamakee Community School District, 588 F.2d 246 (8th Cir.1978); Grunin v. International House of Pancakes, 513 F.2d 114 (8th Cir.1975); In re Flight Transportation Corp. Security Lit., 685 F.Supp. 1092 (D.Minn.1987). The Eighth Circuit also has recognized that a district court is vested with significant discretion where determining a reasonable fee. Cashman v. Allied Products Corp., 761 F.2d 1250, 1256 (8th Cir.1985); Paschall v. Kansas City Star Co., 695 F.2d at 337; Jorstad v. IDS Realty Trust, 643 F.2d at 1312.
Both the Johnson and Lindy tests have been severely criticized by courts and commentators in recent years.[12] In fact, the Third Circuit Task Force on attorneys fees was formulated with the objective of suggesting an analysis that would provide for greater simplicity and predictability. 108 F.R.D. at 270. The task force levied the following specific criticism at this method of calculating fees in common fund cases: First, the lodestar methodology has increased the workload of an already overtaxed judiciary; second, the Lindy mechanism for determining fees is far from objective and has produced results that are for from homogenous; third, the lodestar and multiplier analysis has created a sense of mathematical precision which is unwarranted in terms of the realities of the practice of law and which fails to take into account the utilization of contingent fees; finally, the Lindy approach has led to different abuses which include the padding of bills and a disincentive to settle early on in the litigation. Finally, and most importantly, the lodestar mechanism for determining fees has resulted in confusion and a loss of predictability. The Task Force Report, 108 F.R.D. at 246-50; H. Newburg, Attorney Fee Awards § 207 at pp. 44-45.
Ironically, even though the Lindy and Johnson approaches do not require courts to award class attorneys a percentage of the fund, it appears in class action common fund cases, judges systematically award fees in the same range of percentages, regardless of the type of case, benefits to the class, the number of hours billed, the size of the fund, the numbers in the plaintiff class or any other relevant factors. The Task Force Report, 108 F.R.D. at 247 n. 32; H. Newburg, Attorney Fee Awards § 2.08 at p. 51. Thus, precedent demonstrates that even when courts are using the traditional Lindy approach, by premising their awards on reasonable hours times reasonable rates, their awards fall within a common range with respect to the percentage of the fund that is alloted to attorneys' fees. Weseley v. Spears Leeds & Kellogg, 711 F.Supp. 713, 719 (E.D.N.Y.1989) (19% of the fund awarded under lodestar and multiplier approach); Genden v. Merrill Lynch, Pierce, Fenner & Smith, 700 F.Supp. 208 (S.D.N.Y.1988) (15.7% of fund awarded under lodestar analysis); Kirkorian v. Borelli, 695 F.Supp. 446 (N.D.Cal. 1988) (20% to 30% represent common range of awards); In re Flight Transportation Corporation Securities Litigation, 685 F.Supp. 1092 (D.Minn.1987) (15.9% of fund awarded); In re Warner Communications Securities Litigation, 618 F.Supp. 735 (S.D.N.Y.1985), aff'd, 798 F.2d 35 (2d Cir. *1016 1986) (24.5% award is appropriate); In re Cenco, Inc., Securities Litigation, 519 F.Supp. 322 (N.D.Ill.1981) (multipliers awarded resulting in award of 17% of fund).

C. The Percentage of the Fund as a Means of Awarding Attorneys' Fees in Common Fund Case.
In its Task Report, the Third Circuit endorsed a percentage analysis for the award of fees in common fund case. Its endorsement was premised upon the many disadvantages that have followed the Lindy analysis, in addition to the goals of uniformity and predictability which would be served through the adoption of a percentage approach. The Task Force Report, 108 F.R.D. at 246-50; H. Newburg, Attorney Fee Awards § 207 at pp. 44-45. Commentators recognize, however, that there is no general rule as to what constitutes a reasonable percentage of a common fund. 3 Newburg on Class Actions § 14.03 at p. 190. However, under the circumstances of this case, twenty percent is the upper limit in light of the notice provided to class members by petitioners and defendants.
In the last few years, a number of courts have adopted an outright percentage of the fund analysis when awarding attorneys' fees in common fund cases. Accordingly, in Paul, Johnson, Alston & Hunt v. Graulty, the Ninth Circuit ruled that an award that constituted seven percent of the fund was insufficient as a matter of law. 886 F.2d 268 (9th Cir.1989). The court reasoned that the Lindy approach was cumbersome and that the reality already was that the percentage analysis was routinely utilized by courts. The court concluded that "the percentage scheme with appropriate judicial supervision [is] adequate to protect the integrity of the fee". Id. 487 F.2d at 168.
Other courts, while voicing their preference for the percentage approach blend this new analysis with the traditional analysis. In other words, the courts award a particular percentage and then further support their result by applying a lodestar and multiplier analysis. Basile v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 640 F.Supp. 697 (S.D.Ohio 1986); Mashburn v. National Healthcare, Inc., 684 F.Supp. 679 (M.D.Ala.1988) (19.5% of fund awarded); Edmonds v. United States, 658 F.Supp. 1126 (D.S.C.1987) (raise the fee request from 5%); Kirkorian v. Borelli, 695 F.Supp. 446 (N.D.Cal.1988) (award 25% of common fund as fee).
Apparently, the courts adopting this new approach agree that the lodestar analysis has not been an appropriate mechanism for awarding fees in common fund cases. Commentators do not contend that the traditional procedure should be rejected in the context of statutory fee cases. Newburg, Class Actions § 2.06 at p. 7 (Supp.1989). However, with respect to common fund cases, which necessarily lend themselves to this new procedure, "[t]his percentage fee method is more predictable from plaintiff's counsel's viewpoint and consistent with the practical economies of contingent fee practice based on the expectation of sharing a fair percent of the recovery in return for assuming the risk of nonpayment if unsuccessful, regardless of the number of hours expended." Id.

D. A Fee in the OEP Multidistrict Litigation.
A review of the cited precedent and commentators convinces this Court that it is appropriate to utilize a percentage of the fund procedure in this case for the purpose of according attorneys' fees in this class actin common fund case. Accordingly, petitioners will be awarded 17.5 percent of the fund. This percentage is well within the normal range of fees when considered in terms of the relative size of the fund. Moreover, this award reflects, not only the benefit received by the class as a whole, but also the unusually high rate of return on the proof of claim forms.[13] Thus, not only was a generous size fund established, but also class counsel ensured that a very high number of putative class members would share in that recovery.
*1017 Within thirty days of the date of this order, petitioners should attempt to resolve any and all distribution issues. Howes v. Atkins, 668 F.Supp. 1021 (E.D.Ky.1987). Moreover, the division shall be presented to this Court for its approval within that thirty day period. Any plan of distribution should be premised upon the relative contribution of the various petitioners' counsel and not on hourly rates or hours expended. Howes v. Atkins, 668 F.Supp. at 1024.

APPENDIX
This chart sets out the "lodestar" or straight time requested by all firms involved in the Chrysler Overnight Evaluation Program Multidistrict Litigation. The figure for lead and liaison counsel, which are the first four firms listed, includes hours billed through September 15, 1989. Lead and liaison counsel have not submitted amendments to their fee petition which would encompass September 16, 1989, through the present. The remaining firms have submitted fee petitions through August 31, 1988. These firms should not have incurred any substantial fees after that date.

Berger & Montague (lead counsel) $410,992.50
Kohn, Savett (lead counsel) 341,443.75
Guilfoil, Petzall & Shoemake (liaison counsel) 378,294.50
Ebert & Menees (liaison counsel) 144,734.00
Battle 16,070.00
Carr, Korein, Kunin & Montroy 20,100.00
Cohen, Millstein & Hausfeld 70,630.00
Goldfarb & Greenberg 40,730.00
Greenfield & Chimicles 73,770.00
Holstein, Mack & Dupree 31,105.25
Jardine, Foreman & Appel 49,950.50
Levin, Fishbein, Sedran & Berman 21,773.75
Lynch 23,133.00
Mason 6,675.00
Public Citizens Litigation Group 7,290.00
Statland, Nerenberg, Nassau & Buckley 1,650.00
Slagle 3,638.00
Steinbach 5,175.00

ORDER
Pursuant to the memorandum filed herein this day,
IT IS HEREBY ORDERED that 17.5 percent of the fund be and is awarded to petitioners for the purpose of satisfying their attorneys' fee petitions.
IT IS FURTHER ORDERED that within thirty days of the date of this order all of petitioners shall attempt to resolve how these monies will be divided and distributed among counsel.
IT IS FURTHER ORDERED that petitioners shall submit their plan of distribution to this Court within thirty days of this order and that the plan shall reflect the relative contributions of the various petitioners.
IT IS FURTHER ORDERED that petitioners shall submit a complete itemization of all the costs incurred within thirty days of the date of this order and lead and liaison counsel shall submit an itemization of the additional hours expended on this litigation and their billable hourly rates, so that the record is complete.
*1018 IT IS FURTHER ORDERED that this Court will retain jurisdiction over the attorneys' fees issue.
NOTES
[1] There was a total of fourteen additional firms from different parts of the country involved in this litigation, which submitted fee petitions. These firms did not hold the status of lead or liaison counsel. The names of these firms and their requested "lodestars" are set out in the Appendix attached to this memorandum. "Lodestar" is defined as a reasonable hourly rate times a reasonable hourly fee and has served as the basis of fee awards. In light of the fact that this Court is adopting the percentage fee approach, this particular opinion should not be construed as containing any specific conclusions about the reasonableness of the rates or hours.
[2] At the time of the hearing, the firm of Berger & Montague requested $286,488.00 for 1,303.4 attorneys' hours and paralegal hours; Kohn, Savett, Klein & Graf requested $181,391.00 for 1,300 attorneys' hours and paralegal hours; Guilfoil, Petzall & Shoemake requested $196,775.00 for 1,495 attorneys' hours and 56.75 paralegal hours; and Ebert, Menees & Kriegel requested $92,318.00 for 794.2 attorneys' hours and 165.2 paralegal hours. It was stipulated at the hearing that the only firms that could continue to incur fees subsequent to this hearing and during the claims procedure would be lead and liaison counsel. On September 22, 1989, plaintiffs submitted their most recent amendments to their fee petition which provided that lead and liaison counsel incurred, in total, additional fees in the amount of $1,669,106.00. No fee petitions have been submitted to this Court that include fees and costs from September 15, 1989, to the present or to the end of the claims process (which has not yet occurred).
[3] Blum v. Stenson, 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 1550 n. 16, 79 L.Ed.2d 891 (1984).
[4] The fund shall be valued on the date of this Court's order of January 5, 1990, which required a distribution to those class members whose claims had been validated. Accordingly, class counsel shall be entitled to a percentage of the value of the fund as it stood prior to payments to class members.
[5] Paragraph 35 of the Master Settlement Agreement provides that interest on the Fund will accrue at 6.5% per annum after April, 1988.
[6] For a more detailed discussion of this litigation, see this Court's order of November 24, 1989.
[7] The remainder of the hearing concerned defendant's objections to the lodestars of the other firms in this litigation who did not have the role of lead or liaison counsel.
[8] Lindy Brothers Buildings, Inc. v. American Radiator & Standard Sanitary Care, 487 F.2d 161 (3d Cir.1973), appeal following remand, 540 F.2d 102 (3d Cir.1976).
[9] Defendants and the Attorneys General cite and rely upon Pennsylvania v. Delaware Valley, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987); Pennsylvania v. Delaware Valley, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986); Blum v. Stenson, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), all of which are statutory fee shifting cases.
[10] The only factor that possibly makes our case slightly different is that the fund may expand in the event a fee award would preclude claimants from recovering $500.00 for their claims. Nonetheless, common fund principles still should govern this case given the very basic fact that a fund was created. Moreover, Chrysler evidently received significant benefits during the settlement process in exchange for agreeing to an expandable fund.
[11] Accordingly, even under the lodestar approach the size of the fund may be a significant factor when a court sets an award. Thus, there necessarily is some overlap between the percentage and lodestar approaches even in those instances that a court applies a pure lodestar analysis. Commonwealth of Puerto Rico v. Heckler, 745 F.2d 709, 714 (D.C.Cir.1984) (reasonable fee determined by size of award); Ross v. A.H. Robbins Co., 700 F.Supp. 682 (S.D.N.Y. 1988) (benefit received is significant factor in setting award); Fickinger v. C.I. Planning Corp., 646 F.Supp. 622 (E.D.Pa.1986) (result critical to award of attorneys' fees).
[12] The Johnson test has come under greater criticism than the Lindy approach. The particular criticism of the Johnson analysis is that it fails to provide courts with an analytical framework or guidance as to the factors' relative importance. The Task Force Report, 108 F.R.D. at 245. It is clear that the Lindy test is perceived to be the better rule and has received some acceptance by the Supreme Court in Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).
[13] The rate of verified claim forms in this class action is among the highest in national class actions.